IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MARY A. MOORE,

    Plaintiff,

      v.

JO ANNE B. BARNHART,
Commissioner of Social Security,

    Defendant.

CIVIL ACTION

NO. 1:98-cv-0736-GGB

## ORDER

Through counsel, Mary A. Moore ("plaintiff") brings this action pursuant to the Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security denying her application for a period of disability and for disability insurance benefits.  On September 22, 1992, plaintiff applied for a period of disability and disability insurance benefits.  (AR at 91-94).  The Social Security Administration ("SSA") denied her application initially and upon reconsideration.  (Id. at 103, 112).  Plaintiff requested a hearing before an administrative law judge ("ALJ"), and one was held on March 5, 1996.  (Id. at 113-15; 373-414).  On July 25, 1996, the ALJ issued a decision and concluded that plaintiff was not disabled.  (Id. at 351-69).  On January 9, 1998, the Appeals Council

denied plaintiff's request for review, which rendered the ALJ's decision the final decision of the Commissioner.  (Id. at 415-416; 20 C.F.R.§ 422.210(a)).  Plaintiff then initiated a civil action for judicial review.  (See AR at 417).

On March 5, 1999, the United States District Court for the Northern District of Georgia remanded the action under sentence six of 42 U.S.C. § 205(g) due to the Commissioner's inability to locate the cassette of the March 5, 1996 hearing.  (AR at 423).  A de novo hearing was therefore ordered.  (Id.)

On December 9, 1999, a second hearing was held and plaintiff was again represented by counsel. (AR at 37-90).  The ALJ determined that plaintiff was not disabled, and the Appeals Council affirmed.  (AR at 6-7, 21-36).  Plaintiff has exhausted her administrative remedies, and this case is ripe for judicial review.  The parties have consented to jurisdiction before a United States Magistrate Judge. (Doc. 16).  For the reasons stated below, the Commissioner's final decision denying plaintiff's application for a period of disability and disability insurance benefits is **AFFIRMED**.

## I.    FACTS

Plaintiff, a high school graduate, was 47 years old on her alleged onset date of disability, February 18, 1988.  (See AR at 43-44, 91).  She was 59 years old on April

1, 2000, the date of the most recent ALJ's decision.  (Id. at 44).  Plaintiff was employed at Grady Hospital from 1970 to 1988, as an admitting clerk, secretary, custodian of records, file clerk, and typist.  (Id. at 48-53, 118).  She originally filed for benefits based upon chronic pain in her back, legs, and hands, because her concentration and attention span were limited, and she became upset easily.  (Id. at 95).  She alleged that she became disabled both physically and mentally on the last day she worked at Grady in 1988, when she was wrongfully arrested while at work by two sheriff's deputies and taken to the Clayton County jail.  (Id. at 53-58, 95).

### A.    Medical Records[1]

In an outpatient history form from Grady Hospital dated March 4, 1988, plaintiff was noted to be tearful and nervous. (AR at 167).  She had severe emotional upheaval and a probable degree of conversion.  (Id.)

In letters dated March 23, 1988, May 2, 1988, and June 1, 1988, Dr. J.S. Strachan, a psychiatrist, stated without explanation, that he was treating plaintiff and that she was unable to return to work as of these dates. (AR at 279-81).  In a letter

---

[1] Because plaintiff specifically does not contest the ALJ's findings as they relate to her physical limitations, only her mental health is presently at issue.  (See Doc. 15 at 5).  All medical evidence relating to plaintiff's physical health has therefore been omitted from this summary of relevant medical evidence.

3

dated July 29, 1988, Dr. Strachan stated that he began treating plaintiff on February 26, 1998, shortly after she was "brutalized" at her job, which led to nightmares, anxiety, insomnia, depression, poor concentration, anorexia, and social withdrawal. (Id. at 278).  Her stated that her mood had been "labile."  (Id.)  Dr. Strachan stated that plaintiff had improved after a series of psychotherapy sessions, but that she still need "months of therapy before she can even consider returning to work."  (Id.)  He noted that plaintiff was still tearful when relating the incident.  (Id.)

In a reported dated June 25, 1990, Dr. Strachan stated that plaintiff's condition had continued to improve with therapy "daily or every 3 days" and then "weekly then every two weeks and then every month."  (AR at 175).  He also set forth the following history.  In November 1998, plaintiff reported that she could not return to Grady because she was having flashbacks that caused her to cry and tremble.  (Id.)  On November 3, 1989, she again reported that she was unable to return to Grady, though she was interested in returning to work.  (Id.)  On November 8, 1989, she called and visited Dr. Strachan's office "in a rage screaming" regarding a letter she received related to a worker's compensation claim.  (Id.)  At that point, plaintiff experienced a "resurgen[ce] of her signs and symptoms," and her psychotherapy and medication were increased accordingly.  (Id.)  On January 5, 1990, she appeared

4

"well groomed," and reported that she was "trying to control the hurt and anger she feels since the incident." (Id.) Dr. Strachan reported that as of April 2, 1990, plaintiff "continued to show improvement." (Id. at 175). Plaintiff admitted that she was "preoccupied with her cases, the fact that her orthopedic doctor said that it takes longer for some patients to heal than others," she was given samples of Prozac "to give her more energy during the day," and she felt better after a psychotherapy session. (Id.) Dr. Strachan concluded that plaintiff's "psychiatric impairment has improved since February 26, 1988 due to therapy," though she felt that she had been "abused" and that her "needs have not been properly addressed." (Id. at 176).

A letter from Cassandra Newkirk, M.D., dated September 14, 1991, states that she saw plaintiff once every two weeks "during 1991 until August 1991." (AR at 178). Dr. Newkirk stated that plaintiff had "made some progress but continues to become rather upset and anxious when talking about the incident at Grady Hospital," and "continues to harbor much anger and resentment in general." (Id.) Dr. Newkirk recommended that plaintiff continue to take antidepressant medication and remain "in therapy." (Id.)

A psychological evaluation dated December 16, 1992, from Dr. John Mallet states that plaintiff reported insomnia, "something like flashbacks," crying,

depression, anxiety, nervousness, fearfulness, and that she "can't stand for people to get upset with her." (AR at 228-29). Plaintiff stated that she had last seen a psychiatrist in June 1992. (<u>Id.</u> at 228). Dr. Mallet stated that the notes from Dr. Strachan "basically yield a diagnostic impression of Post-Traumatic Stress Disorder" ("PTSD"). (<u>Id.</u> at 229). Dr. Mallet described plaintiff as "friendly and cooperative with affect in the normal range," and stated that her memory, speech, judgment, and stamina were good. (<u>Id.</u> at 230). She was "fully oriented to time, place, person and situation." (<u>Id.</u>) Plaintiff's daily activities included making her bed, light housework, and some driving. (<u>Id.</u>) She reported that she would "use the public rails and can go alone, but usually has somebody with her." (<u>Id.</u>) Dr. Mallet found that plaintiff had "an intact personality" with "no visible anxiety or depression," and was "able to relate to other people with a fairly good range of affective responses." (<u>Id.</u> at 232). He stated that she also exhibited "some sociopathic-like responses. . . suggesting that dependency may be sought in borderline kinds of ways." (<u>Id.</u>) He stated that "some of her responses occur in the records of adult schizophrenics and in this instance probably point to gross emotionally immaturity." (<u>Id.</u>) Dr. Mallet also noted "narcissism and preoccupation with appearance," and "some oral responses indicative of infantile preoccupations with satisfactions." (<u>Id.</u>)

He diagnosed plaintiff as having PTSD, a personality disorder, and as functioning within the low to average range of intelligence. (AR at 232). He stated that the diagnosis of PTSD was based upon "the history of treatment from the psychiatric notes, from the claimant's recital of symptoms, and by a brief tearfulness observed during the interview." (Id.) Dr. Mallet believed that her personality disorder was likely pre-morbid. (Id.) He stated that "[a]t least clinically, and from much of the testing, the claimant appears to be in a range where work is possible," and that "there is somewhat of a discrepancy between the impressions from testing versus those symptoms verbalized by the claimant." (Id. at 233).

On December 30, 1992, after reviewing the medical evidence, a state agency psychological consultant reviewed plaintiff's medical history and issued an assessment. (AR at 154-65). The consultant determined that plaintiff could return to her past work as "secretary / medical records." (Id. at 153).

In a Mental Residual Functional Capacity Assessment form, the state agency consultant found that plaintiff was not significantly limited as to the following abilities: (1) remember locations and work-like procedures; (2) understand and remember very short and simple instructions; (3) understand and remember detailed instructions; (4) carry out very short and simple instructions; (5) carry out detailed

7

instructions; (6) maintain attention and concentration for extended periods;[2] (7) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (8) sustain an ordinary routine without special supervision; (9) work in coordination with or proximity to others without being distracted by them; (10) make simple work-related decisions; (11) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (12) interact appropriately with the general public; (13) ask simple questions or request assistance; (14) accept instructions and respond appropriately to criticism from supervisors; (15) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; (16) be aware of normal hazards and take appropriate precautions; and (17) set realistic goals or make plans independently. (Id. at 154-55).

---

[2]The parties dispute whether the consultant indicated that plaintiff was not significantly limited or moderately limited in this respect because both boxes were marked in this category. (See AR at 154). The Commissioner argues that the consultant had crossed out the indication that plaintiff was moderately limited in this respect and then indicated with an "X" in the column for "not significantly limited," that this was the intended conclusion. The undersigned agrees that this appears to be the case.

The state agency psychologist found that plaintiff was <u>moderately limited</u> in her abilities to: (1) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (2) respond appropriately to changes in the work setting; and (3) travel in unfamiliar places or use public transportation. (AR at 155). The assessment stated that plaintiff should have been able to follow and carry out duties, that her concentration was basically intact, and that she would have some difficulties with coworkers because she complained a lot and was demanding and self centered. (<u>Id.</u> at 156). It also noted that plaintiff seemed to fear traveling by herself. (<u>Id.</u>) Plaintiff was found to have anxiety and "personality disorder NOS." (<u>Id.</u> at 161). The consultant found that plaintiff had <u>slight limitation</u> in restriction of activities of daily living, <u>moderate limitation</u> in maintaining social function, and <u>seldom</u> had deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner. (<u>Id.</u> at 164).

On January 14, 1993, Dr. Philip G. Wiltz conducted an Orthopaedic Evaluation of plaintiff. (AR at 235). He concluded that she had no orthopaedic impairment, but noted that she was anxious and crying during the examination and believed a psychiatric evaluation was appropriate. (<u>Id.</u>)

9

On July 11, 1995, Jay Clark, Ph.D., took a medical history from plaintiff, performed a mental status examination, and administered psychological tests. (AR at 333-42). He stated that he believed plaintiff overstated her complaints of emotional distress, that she did not appear to be "seriously interested in going back to a problematic work career in what would probably be a semi-skilled type of employment at the very best," and that her "prognosis [was] poor due to negative attitude and lack of motivation for independence." (Id. at 337-38). With respect to work-related functional activity, Dr. Clark found that plaintiff had difficulty grasping instructions for very simple uncomplicated job operations. (Id. at 338). She had poor concentration and attention, and would not relate well when working with others. (Id.) If she returned to a work setting, it should be in a situation where she would not have to adapt to change or make independent decisions. (Id.) In connection with these findings, Dr. Clark stated again that plaintiff's work-related limitations were largely attributable to limited motivation and negative attitude. (Id.)

Dr. Clark concluded that plaintiff had a factitious disorder,[3] borderline intellectual functioning, and a narcissistic personality disorder, "sociopathic-like

---

[3]Factitious disorder is "a mental disorder characterized by repeated, intentional simulation of physical or psychological signs and symptoms of illness for no apparent purpose other than obtaining treatment." The Free Dictionary, Medical Dictionary, available at http://medical- dictionary thefreedictionary.com/Factitious+disorder.

10

responses and emotional immaturity." (AR at 339).  He rated plaintiff's abilities to follow work rules, relate to coworkers, deal with the public, and use judgment as "fair," and further stated that she had difficulty "communicating with others because of her own inner conflicts and attitudes."  (Id. at 340).  He rated her abilities to understand, remember and carry out complex job instructions and detailed but not complex job instructions as "poor/none," and her ability to understand, remember and carry out simple job instructions as "fair."  (Id. at 341).  In this area he stated that "[m]uch depends on her attitude and mood at the moment.  Tends to withhold her best effort much of the time.  Views self as an invalid."  (Id.)  Dr. Clark rated plaintiff's abilities to maintain personal appearance and relate predictably in social situations as "fair," and her ability to behave in an emotionally stable manner as "poor/none."  (Id. at 341).  He stated in connection with these evaluations that plaintiff's "behavior may well be selective depending more upon issues and context than upon her actual physical condition."  (Id.)  Finally, as to "other work-related activities," Dr. Clark stated that "[b]ackground medical material does not support the full range of her physical complaints which derive from long-standing personality deficits."  (Id. at 10).

11

**B.    Plaintiff's Hearing Testimony**

At the administrative hearing on December 9, 1999, plaintiff testified that she was employed at Grady Hospital from 1970 to 1988, as an admitting clerk, secretary, custodian of records, file clerk, and typist. (AR at 48-53, 118). On the last day she worked at Grady in 1988, plaintiff was wrongfully arrested by two sheriff's deputies and taken to the Clayton County jail. (Id. at 53-58). In addition to sustaining physical injuries from the arrest, she underwent psychological treatment for post traumatic stress arising from the incident. (Id. at 56-63). She was on "heavy medication" following the incident, and her doctor told her that she should not return to work because it was unclear "what would tick [plaintiff] off." (Id. at 60). Between 1988 and 1994, plaintiff normally awoke between 9:00 and 10:00 a.m., dressed herself with some difficulty, prepared very basic meals, watched television and rested. (Id. at 66-67).

Plaintiff testified that she was not able to drive at times because she took medications that could make her drowsy, and a family member drove her to doctor's appointments. (Id.) She attended church during this time period. (Id. at 67-68). At the time of the hearing, she became tearful when recounting the arrest incident, and stated that approximately twice a week she cried uncontrollably. (Id. at 71). Plaintiff

12

experienced stress and frustration because of her physical limitations.  (<u>Id.</u> at 72-73).

She also testified that she cried when she heard sirens because it brought back

memories of the incident, and that she sometimes awoke at night "screaming and

stuff like that."  (<u>Id.</u> at 73).  Plaintiff stated that she could not work because she

became stressed and "ticked off" easily.  (<u>Id.</u>)

C.     **Vocational Expert's Hearing Testimony**

A vocational expert ("VE") testified that he had reviewed the case file, and he

described plaintiff's past work experience.  (AR at 74-77) . The ALJ then asked the

VE to assume a hypothetical individual of plaintiff's age, education, and work

experience with the following exertional limitations: "occasionally lift and carry

objects no more than 20 pounds; frequently lift and carry objects up to 10 pounds;

stand or walk with normal breaks for six hours in an eight hour work day; sit with

normal work breaks for a total of six hours a day in an eight hour work day.  (<u>Id.</u> at

77-78).  The ALJ asked the VE to assume the following non-exertional limitations:

> [A]s to balancing occasionally, stooping occasionally,
> crouching occasionally, crawling occasionally and has the
> following additional non-exertional limitations . . . . As to
> following work rules, that's going to be rated as good.
> Relate to coworkers, fair.  Deal with the public, fair.  Use
> judgment, good.  Interact with supervisors, good.  Deal
> with work stresses, fair.  Function independently, fair.
> Maintain attention and concentration, good.  As to complex

13

> job instructions, good. Detailed but not complex job
> instructions, good and simple job instructions, good. As to
> maintain personal appearance, fair. Behave in an
> emotionally stable manner, fair. Relate predictably in
> social situations, fair and demonstrate reliability, fair.

(Id. at 78).

The VE testified that such an individual would be able to perform the jobs of "subscription clerk, medical records file clerk, [and] clerk typist," but not the jobs of admitting clerk, medical records, or medical secretary because "some of the fairs might preclude her from doing" these more stressful jobs effectively. (Id.)

Plaintiff's counsel directed the VE to the psychological evaluation completed by Dr. Clark, particularly his conclusions that plaintiff's abilities to do the following were rated as fair: follow work rules, relate to coworkers, deal with the public, use judgment, interact with supervisors, maintain attention and concentration, simple job instructions, maintain personal appearance, and relate predictably in social situations. (AR at 80-81). The VE responded that "this rating would only permit the performance o[f] the unskilled worked," though there "would still be many jobs" that such an individual could perform. (Id. at 81-82). Counsel then stated that "Dr. Clark rated the claimant as poor in a couple of categories including function independently and deal with work stresses. Does that change your answer as far as

14

the unskilled jobs?"  (Id. at 82).  The VE responded that it did because, in that

situation, "one would not be able to do unskilled work."  (Id.)

Upon questioning by the ALJ, the VE noted that the report by Dr. Clark was

dated July 26, 1995.  (AR at 83).  The ALJ asked whether "this hypothetical

individual using this particular form [could] perform any work at the sedentary or

the light unskilled level based on her age during this time period."  (Id.)  The VE

responded that such an individual could perform the following light unskilled jobs

of office helper, photocopy machine operator, and bobbin sorter.  (Id. at 83-84).  The

VE clarified that such an individual could perform these light unskilled jobs

notwithstanding the ratings of "fair" posed by plaintiff's attorney based upon Dr.

Clark's report, but could not perform these unskilled jobs if she had the ratings of

"poor."  (Id. at 84-85).

### D.   ALJ's Findings

In a written opinion, the ALJ stated that he had reviewed "all the evidence of

record" and determined that plaintiff was not disabled within the meaning of the

Social Security Act on or prior to the last date on which she was insured for benefits,

December 31, 1994.  (AR at 21-22).  In a section entitled "Evaluation of the

Evidence," the ALJ first stated as follows:

15

> Interested parties have been furnished copies of the decision and order  [by the previous ALJ] which set forth in adequate detail the evidence then of record and the basis for the action taken.  The vacated decision has no legal force or effect, but its contents are adequate recitation of the evidence of record at this time.  Pertinent data are incorporated herein by reference but not the findings and conclusions.

(Id. at 22).  That previous decision referenced, inter alia, records from Dr. Strachan, Dr. Mallet, Dr. Wiltz, and Dr. Clark.  (See id. at 356-61).

The ALJ then specifically noted that the medical evidence indicated that prior to December 31, 1994, plaintiff had a personality disorder, which, along with her physical impairment of chronic pain syndrome, "constituted a severe impairment within the meaning of the Regulations, but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4." (AR at 24, 27).  In evaluating plaintiff's RFC, the ALJ stated as follows:

> [T]he State Agency medical consultant who reviewed the evidence found that [plaintiff] was only moderately limited in her ability to respond appropriately to changes in the work setting and in the ability to travel in unfamiliar places. However, the medical consultant found that [she was] not significantly limited in all other areas representing her ability to function, including understanding and memory, sustained concentration and persistence and social interaction.  Additionally, the medical consultant opined that the claimant's condition was not severe enough to prevent her from performing her past relevant work, and,

16

> therefore, found that she could return to her past job as
> secretary/medical records.
>
> . . .
>
> Based on a consideration of the entire record, the
> undersigned finds that prior to the date the claimant's
> insured status expired, December 31, 1994, she had the
> ability to sit for up to 6 hours in an 8-hour workday, and
> she had the ability to stand and walk a total of up to 6
> hours out of an 8-hour workday.  She had the ability to
> occasionally lift and carry up to 20 pounds and up to 10
> pounds frequently.  She had fair abilities to deal with work
> stresses, function independently, maintain appearance,
> behave in an emotionally stable manner, relate predictably
> in social situations, demonstrate reliability, relate to co-
> workers, and deal with the public.  The claimant also had
> good abilities to follow work rules, interact with
> s u p e r v i s o r s ,   u s e   j u d g m e n t ,   m a i n t a i n
> attention/concentration and understand, remember and
> carry out complex, detailed and simple job instructions.

 (AR at 25).

The ALJ concluded that, based upon the VE's testimony, plaintiff's RFC

would have permitted her to return to her prior work as a "medical file clerk, clerk

typist, and subscription clerk."  (Id.)  The ALJ also found that plaintiff was "not

entirely credible."  (Id. at 26).  In regard to her mental issues in particular, the ALJ

stated as follows:

> [T]here is no evidence in the record of any regular mental
> health treatment.   In fact, her treating physician, Dr.

17

Strachan, shows that he treated the claimant . . . from February 26, 1988 to December 31, 1988, for post traumatic stress disorder, but at the time of his last report, July 19, 1988, he noted that the claimant had improved [with therapy] . . . . Considering these factors, the [ALJ] finds the claimant's statements concerning her condition and limitations and their impact on her ability to work prior to her date last insured are not fully credible.

(Id.)

## II.    The Parties' Positions

Plaintiff argues that the ALJ's RFC finding is not supported by substantial evidence.  (Doc. 15 at 14-22).  She specifically contends that the non-examining reviewing state agency physician found that she was "moderately limited" in the following four areas: (1) ability to maintain attention and concentration for extended periods; (2) ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (3) ability to respond to changes in work setting; and (4) ability to travel to unfamiliar places.  (Id. at 14-15).  She states that Dr. Clark agreed that she was moderately limited in her ability to maintain attention and concentration.  (Id. at 16).  Plaintiff then states that the ALJ stated that she was moderately limited only in only two respects -  ability to respond to changes in work setting and ability to travel to unfamiliar places, (3) and (4), supra - but was otherwise not significantly limited in work functions, and that she had "good ability"

18

to maintain attention and concentration.  (<u>Id.</u> at 15).  Plaintiff argues that the ALJ's failure to explain the conflict between his findings and the medical record renders his RFC assessment unsupported by substantial evidence.  (<u>Id.</u> at 16).  Plaintiff also argues that the ALJ focused on the medical evidence prior to December 31, 1994, but failed to specifically address findings by Dr. Clark on July 11, 1995, that her functional limitations were more limited than found by the ALJ.  (<u>Id.</u> at 18).

The Commissioner responds that substantial evidence supports the ALJ's determination that plaintiff was not disabled during the relevant time period.  (Doc. 17 at 5-19).

## IV.   **STANDARD OF REVIEW**

In reviewing the Commissioner's decision, this court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. <u>Barnes v. Sullivan</u>, 932 F.2d 1356, 1358 (11th Cir. 1991).  The court's only role is to determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings.  <u>Walden v. Schweiker</u>, 672 F.2d 835 (11th Cir. 1982); 42 U.S.C. § 405(g). "Substantial evidence" means such "relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>MacGregor v. Bowen</u>, 786 F.2d 1050,

19

1053 (11th Cir. 1986); Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). It may be present even if a preponderance of the evidence weighs in favor of the claimant. Barnes, 932 F.2d at 1358.

This standard of review, however, does not "relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether the substantial evidence supports each essential administrative finding." Walden, 672 F.2d at 838. Indeed, "[i]t is incumbent upon the reviewing court to examine the findings and decisions of the [Commissioner] in light of the record in its entirety, not only that evidence which supports the decision." Lamb v. Bowen, 847 F.2d 698, 701 (11th Cir. 1988).

In contrast to the Commissioner's findings of fact, no presumption of validity attaches to the Commissioner's application of the law. Lamb, 847 F.2d at 701. "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983). Thus, the Commissioner must "apply the correct law" and, importantly, must also "provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted . . . ." Keeton v. Department of Health and Human Services, 21 F.3d 1064, 1066 (11th Cir.

20

1994) (citing <u>Cornelius v. Sullivan</u>, 936 F.2d 1143, 1146 (11th Cir. 1991)); <u>see</u> <u>also</u> <u>Cowart v. Schweiker</u>, 662 F.2d 731, 735 (11th Cir. 1981) (the ALJ must "state specifically the weight accorded to each item of evidence and why he reached that decision.  In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence"); <u>Owens v. Heckler</u>, 748 F.2d 1511, 1514 (11th Cir. 1984) (the Commissioner must engage in "reasoned decision making"); <u>Ryan v. Heckler</u>, 762 F.2d 939, 941-42 (11th Cir. 1985) (the ALJ must "state with sufficient clarity the legal rules being applied and the weight accorded the evidence considered").

"A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record." <u>See</u> <u>Hale v. Bowen</u>, 831 F.2d 1007, 1012 (11th Cir.1987); <u>MacGregor v. Bowen</u>, 786 F.2d 1050, 1054 (11th Cir.1986).

## V.    <u>DISCUSSION</u>

A review of the evidence shows that the ALJ's determination that plaintiff retained the RFC to return to her past work as a medical file clerk, clerk typist, or subscription clerk is supported by substantial evidence.  <u>See</u> <u>Walden</u>, 672 F.2d at

21

838; 42 U.S.C. § 405(g).  First, as noted by the ALJ, Dr. Strachan's records stated that plaintiff was improving during 1988, 1989, and 1990, following the arrest incident.  (AR at 26, 175-76).  While Dr. Strachan's records also stated that plaintiff was not ready "to return to work," and, particularly, did not feel that she could return to work at Grady, this does not preclude a finding that she was unable to return to work for a different employer.  (See id. at 175-76, 278-81).  Dr. Newkirk's letter similarly indicated that plaintiff experienced anger and anxiety, but had "made some progress" in this respect as of September 1991.  (Id. at 178).

Further, Dr. Mallet and Dr. Clark determined that plaintiff's diagnosis of PTSD, symptoms of anxiety and depression, and her compromised abilities to concentrate and get along with others were inconsistent with clinical observations, that she overstated her complaints of emotional distress, that her limitations were due at least in part to her poor attitude and lack of motivation, and that her personality disorder appeared to be pre-morbid.  (Id. at 232-33, 337-39).  Also, as noted by the ALJ, there is no indication in the record that plaintiff received psychological or psychiatric treatment after June 1992.  (Id. at 26; see id. at 228).  Finally, both Dr. Mallet and the state agency consultant indicated that plaintiff could have worked during the time she alleged that she was disabled.  (Id. at 153, 232-33).

22

This same evidence also supports the ALJ's determination that plaintiff was not entirely credible.  See AR at 26; Hale, 831 F.2d at 1012; MacGregor, 786 F.2d at 1054.

To the extent that the ALJ incorrectly recited the state agency consultant's characterization of plaintiff's limitations, the undersigned finds that these inaccuracies were immaterial.  To the extent that the ALJ determined that plaintiff was less impaired in some areas than Dr. Clark indicated, the undersigned notes that the ALJ was entitled to weigh the evidence in reaching his determination of plaintiff's RFC.  See Barnes, 932 F.2d at 1358.  Accordingly, neither of these arguments provide a basis for remand.

Finally, plaintiff's argument that the ALJ's decision was not supported by substantial evidence because he incorporated by reference facts set forth in the decision by the previous ALJ in 1996 is without merit.  Plaintiff provided no authority for this argument, and the undersigned finds that the ALJ's statement explicitly incorporating the previous ALJ's "recitation of the evidence of record" was adequate.

23

## VI.    <u>CONCLUSION</u>

For the foregoing reasons, the Commissioner's final decision denying plaintiff's application for a period of disability and disability insurance benefits is **AFFIRMED.**

**IT IS SO ORDERED** this 29th day of March, 2007.

*Gerrilyn G. Brill*
_____
GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE

24